# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL TYRELL HOLSTON,

   Petitioner,

v.

SUPERINTENDENT MICHAEL D. OVERMYER,

   Respondent.

NO. 3:16-CV-1042

(JUDGE CAPUTO)

## **MEMORANDUM**

Presently before me is the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) filed by Petitioner Michael Tyrell Holston ("Petitioner"). For the reasons that follow, the petition will be denied.

## **I. Background**

The facts of this case have been summarized by the Pennsylvania Superior Court as follows:

> Moshe Cohen, a longtime friend of the victim, seventeen year old David Carr, testified that on July 30, 2009, he and Carr went to the 1900 Block of State Street in Harrisburg to try to buy marijuana from a person known as Source. Source was not around. The Defendant Michael Holston spoke with them, and told them that he could get them a half pound of marijuana.
>
> Cohen made arrangements with a few other friends to pool their money to buy the half pound, and gave it to Carr. Two days later, on August 2, Cohen met Carr at the Burger King on Cameron Street to obtain the marijuana. The Defendant and a friend of Carr's, Ashton Dickerson, were in Carr's vehicle. When Carr and Cohen returned home and weighed the marijuana, it weighed 5 ounces, not the 8 ounces for which they paid Holston. Carr took the shorted portion for himself. Later, on August 7, Carr spoke to Moshe about his intention to visit Defendant the next day and get money back for the shortage. Moshe discouraged him from doing so.
>
> Video footage taken August 8, 2009, from a nearby restaurant store, shows David Carr's vehicle pull up to 1900 North Street. A person approached the vehicle; Carr waited

in his vehicle for about 17 minutes, then got out of his car and walked to 1905 North Street, near Defendant's address.

Tanaya Scott lived at 1907 North Street. She knew Defendant and spoke with him frequently. On the morning of August 8, 2009, Scott spoke to the Defendant and saw him smoking 'water' or 'wet' (embalming fluid) at 8:30 or 9:00 a.m., and also about an hour before the shooting. Scott testified that it was common for Defendant to smoke water daily. That afternoon, before the shooting, although Scott testified that Defendant was 'bouncing around' and talking a lot, he walked the dog with her son. When he returned, Defendant took off his necklace, gave it to Scott's son, and told him he was a 'good boy'. Shortly before the shooting, Scott overheard Defendant talking on the phone and heard him say, 'I'm sorry. I know I got you waiting.' Scott observed that Defendant had a handgun in his right top pocket, and something heavy in his cargo pants pocket, which he touched frequently.

Scott observed Defendant walk to the front of the building, and return with David Carr. Defendant introduced Carr to Scott; Defendant joked that Carr was short, like him, but had big feet. Scott went into her house.

From her bathroom window, Scott could see down into the alley between 105 and 1907 North Street. She heard loud talking, and heard Carr say, 'Stop playing,' to which the Defendant replied, "No M———.F———." She then heard running. In a written statement to police, Scott stated that she saw Defendant chasing Carr down the alley with his arm outstretched. She next heard gunshots.

Rabia Kouzouni testified, through an interpreter, that at the time of the shooting, she was taking her trash out from the kitchen door of her house at the 1900 block of State Street. From her window, Mrs. Kuzouni saw people arguing, one in a very loud voice. She could see that the two people were standing "too close ... very close". She heard someone say something, which she did not understand. As Mrs. Kouzouni began to take out the trash, she heard gunshots, and retreated inside. She hid inside, and heard the sound of someone running. She remained in the kitchen, and looked outside to see someone lying down.

Ed Polston testified that he knew Defendant through Defendant's visits to Polston's sister's house at 1900 North Street. Polston went to his sister's house on the day of the shooting. When he arrived, someone told him that a person had been shot, and to get in the house. As Polston sat on the couch, the Defendant tried to put a gun in Polston's pocket, saying something to the effect of 'just take this' to which Polston responded 'No.' Polston and the Defendant then spoke briefly about a mutual friend who owed Polston five dollars. The Defendant then left, and went to the store.

Monique Winston was also at 1900 North Street when she heard that something bad had happened. After police arrived at the alley, she went onto the balcony and watched what was occurring on the street. Within minutes, the Defendant arrived at her house, came into the living room and spoke with Ed Polston. Ms. Winston asked Defendant if she could go look out of Defendant's bedroom window, to be able to see where the body was lying. Defendant stopped talking, and gave her a blank stare. Defendant then left the house, crossed the street, and entered the restaurant store. As Ms. Winston watched police lead Defendant out of the store, Defendant yelled to her, 'Mo, call my mom. Don't worry about me. I'll be back. I'm extra wavy.'

Monique Winston testified that during the time she dated Defendant, she smoked wet with him three or four times a day, and that the effects lasted about forty five minutes, then they would have to smoke it again to get high. When Defendant was on wet, he could function, and was not out of control or violent.

Ed Polston's sister, Monique Polston, was also at 1900 North Street at around 4:30 p.m. on the day of the shooting. Soon after she heard that someone had been shot, Defendant arrived. When Ms. Polston asked him what happened, he said he didn't know, that gunshots awoke him, and asked for a cigarette. Ms. Polston asked him about the twenty dollars he owed her, to which he responded he would pay her later. Defendant spoke and walked normally, although he seemed nervous.

At approximately 4:35 p.m., while working the 3 p.m. to 11 p.m. shift in the Allison Hill area, Sergeant Steven Novacek of the Harrisburg Police received a call of shots fired with a person down at 19th Street and Miller Alley. Officer Novacek exited his vehicle and walked up the alleyway toward the person down. There, Officer Novacek saw a young white male, in a kneeling position, bent backwards, obviously deceased. Other officers began responding, preserving the scene, and collecting evidence.

Officer Kenneth Young of the Harrisburg Police, assigned to a robbery task force, also received a call regarding a shooting at the 1900 Block of Miller Street, with one person deceased. After arriving at the scene, Officer Young assisted with canvassing neighbors to ask what they may have heard or observed. Two people indicated that the shooter went into 1900 North Street. Officer Young observed a person who fit the description of the shooter, later identified as the Defendant, exit the residence, cross the street and enter a store. Officer Young entered the store. When police spoke to him, the Defendant asked the officer to 'hold on' while he paid for his food. When asked for identification, Defendant stated that he had a gun in the

3

pocket of his cargo pants, and that the gun was registered. Defendant then twisted his body to evade search of his right pocket, in which police found another gun which had live bullets in the magazine and one in the chamber. [Officer Young] stated that Defendant followed the officers' simple commands, walked and talked normally, and did not exude the pungent odor of PCP. Inside the store, Defendant cooperated with police. As Police loaded Defendant in the police van, Defendant yelled to people watching to call his mother, and shouted a phone number.

Detective Donald Heffner of the Criminal Investigation Division of the Harrisburg Police Department responded to the crime scene at about 4:50 p.m. After securing the crime scene and assisting officers who apprehended Defendant, Detective Heffner next saw Defendant in the booking room. Defendant had a tissue or paper towel and was attempting to wipe his hands. Concerned that Defendant was removing gun residue and or blood from his hands, Detective Heffner took the tissue from Defendant. Defendant was 'passive aggressive', in that he reluctantly followed commands. Detective Heffner did not seek permission to obtain a blood sample, in that he did not believe Defendant was intoxicated. When Detective Heffner told Defendant that he would be charged with possession of handguns, Defendant blurted out, falsely, that one of the guns belonged to his mother, and that he had a permit for it. Investigator William Kimmick of the Harrisburg Police had contact with Defendant in the booking area at approximately 8 p.m. on the night of the shooting, for the purpose of obtaining swabs from his hands to test for gunshot residue. Defendant did not appear to be under the influence, and was not argumentative, although he ignored commands.

Wayne Ross, M.D., a forensic pathologist, testified that he conducted an autopsy of David Carr and determined the cause of death as multiple gunshot wounds to the top of the head. Eight bullets entered the head, six penetrated the skull. Dr. Ross reviewed a photograph of the position of the victim at the crime scene. Dr. Ross opined that the victim was shot from approximately [2 to 3 feet], as evidence by 'stippling', abrasions to the skin caused by gunshot residue. The wounds were consistent with an 'execution style' killing, that is, within a few feet, over the top of the head, and directly to the brain or skull.

The defense called Lawrence Guzzardi, M.D., as an expert toxicologist. Dr. Guzzardi testified that based upon his understanding of the amount of formaldehyde the Defendant smoked, as related to him by Defendant, he did not believe that Defendant was capable of forming the specific intent to commit murder.

*Commonwealth v. Holston*, No. 223 MDA 2014, 2014 WL 10558598, at *1-4 (Pa.

Super. Ct. Oct. 28, 2014) (citation, internal citations, and footnotes omitted).

Following a jury trial in the Court of Common Pleas of Dauphin County, Pennsylvania, Petitioner was convicted of first-degree murder and two counts of carrying a firearm without a license. *See id*. at *1. Petitioner was sentenced to life imprisonment for first degree murder and to concurrent terms of 3-7 years on the firearm convictions. *See id*.

Petitioner filed post-sentence motions, which were denied by the trial court, and then he filed a direct appeal to the Pennsylvania Superior Court. *See id*. Holston's judgment of sentence was affirmed by the Superior Court on August 17, 2012. *See id*.

Petitioner filed a *pro se* Post Conviction Relief Act ("PCRA") petition in the trial court on February 1, 2013. *See id*. Counsel was then appointed to represent Petitioner, and an amended, counseled PCRA petition was filed. *See id*. The trial court dismissed the PCRA petition on January 14, 2014. *See id*.

Petitioner appealed the dismissal of the PCRA petition to the Superior Court. *See id*. In that appeal, Petitioner raised the following three issues: (1) his constitutional rights were violated because the police failed to give him *Miranda* warnings before obtaining his custodial statement; (2) trial counsel was ineffective for failing to object to the admission of a photograph depicting the victim as he was discovered by the first responding police officer; and (3) appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal. *See id*. at *4-6. The Superior Court affirmed the trial court's denial of PCRA relief on October 28, 2014. *See id*. at *6.

On December 21, 2014, Petitioner filed another *pro se* PCRA petition in the trial court. (*See* Doc. 6-10, 2). The trial court dismissed that petition on February 23, 2016. (*See* Doc. 6-2, 11).

Petitioner filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on June 1, 2016. (*See* Doc. 1, *generally*). Therein, Petitioner raises three grounds for relief: (1) his constitutional rights were violated because the police

5

failed to give him *Miranda* warnings before obtaining his custodial statement; (2) trial counsel was ineffective for failing to object to the improper admission of inflammatory photographs; and (3) appellate counsel was ineffective for failing to raise the proper issue on appeal, (*see id*.), *i.e.*, the same issues he raised before the Superior Court on appeal from the denial of his first PCRA action.

Respondent filed an answer to the § 2254 petition on July 27, 2016. (*See* Doc. 6, *generally*). On August 12, 2016, Petitioner filed a traverse. (*See* Doc. 7, *generally*). The petition for habeas corpus is thus ripe for disposition.

## II. Legal Standards

**A.   Federal Habeas Review of Exhausted Claims.**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §§ 2241-2254, mandates that petitioners demonstrate that they have "exhausted the remedies available in the courts of the State" before seeking federal habeas relief. 28 U.S.C. § 2254(b)(1)(A). An exhausted claim is one that has been "fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process," and which has been adjudicated on the merits. *See Carpenter v. Vaughn*, 296 F.3d 138, 146 (3d Cir. 2002) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999)); *Johnson v. Williams*, 568 U.S. 289, 302 (2013). "Fair presentation" of a claim merely requires the petitioner to "present [the] federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Greene v. Palakovich*, 606 F.3d 85, 93 (3d Cir. 2010) (citation omitted). For § 2254(d) purposes, a claim has been adjudicated on the merits "when a state court has made a decision that finally resolves the claim on the basis of its substance, rather than on a procedural, or other, ground." *Collins v. Sec'y of Pa. Dep't of Corr*., 742 F.3d 528, 545 (3d Cir. 2014) (quoting *Thomas v. Horn*, 570 F.3d 105, 117 (3d Cir. 2009)).

When a claim is properly exhausted in the state courts and then raised on federal habeas review, the level of deference afforded to the state-court decision is substantial.

6

*Bey v. Superintendent Greene SCI*, 856 F.3d 230, 236 (3d Cir. 2017), *petition for cert. filed sub nom.*, *Gilmore v. Bey*, No. 17-681 (U.S. Nov. 8, 2017). The AEDPA "does not 'permit federal judges to . . . casually second-guess the decisions of their state-court colleagues or defense attorneys.'" *Collins*, 742 F.3d at 543 (quoting *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013)). Accordingly, under § 2254(d), federal habeas relief is unavailable for exhausted claims unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

This is an intentionally difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" clearly established Supreme Court precedent. *Id*. Therefore, to obtain federal habeas relief on an exhausted claim, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Id*. at 103.

Finally, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petition[er] must overcome the limitation of § 2254(d)[ ] on the record that was before that state court"; "evidence introduced in federal court has no bearing on § 2254(d)[ ] review." *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) (footnote omitted). "[D]istrict courts cannot conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d). Otherwise, federal habeas petitioners would be able to circumvent the finality of state court judgments by establishing a new factual record." *Brown v. Wenerowicz*, 663 F.3d 619, 629 (3d Cir. 2011). "This would contravene AEDPA, which requires petitioners to diligently present the facts in state court before proceeding to the federal courthouse." *Id*.

**B.    Federal Habeas Review of Unexhausted, Defaulted Claims.**

If a state prisoner has not fairly presented a claim "to the state courts but state law clearly forecloses review, exhaustion is excused, but the doctrine of procedural default may come into play." *Carpenter*, 296 F.3d at 146 (citations omitted). Generally, if a prisoner has procedurally defaulted on a claim by failing to raise it in state-court proceedings, a federal habeas court will not review the merits of the claim, even one that implicates constitutional concerns. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 747-48 (1991) and *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)).  A few limited exceptions to this rule exist.

One exception is that "[a] prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id*. at 10 (citing *Coleman*, 501 U.S. at 750).  "Cause for a procedural default exists where something external to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule." *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (alterations in original) (citations and internal quotation marks omitted).  To establish prejudice, a petitioner must show not merely that there were errors that created a possibility of prejudice, but that they "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Holland v. Horn*, 519 F.3d 107, 112 (3d Cir. 2008) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  If cause and prejudice are established, the federal court reviews the claim "*de novo* because the state court did not consider the claim on the merits."  *Bey*, 856 F.3d at 236 (citation omitted).

Another rare exception that will excuse a procedural default is if the petitioner can show that "failure to consider the claim will result in a fundamental 'miscarriage of justice.'"  *Carpenter*, 296 F.3d at 146 (quoting *Coleman*, 501 U.S. at 750).  To satisfy the "fundamental miscarriage of justice" exception, a petitioner typically will have to show actual innocence.  *Leyva v. Williams*, 504 F.3d 357, 366 (3d Cir. 2007) (citation omitted).

8

## C. Ineffective Assistance of Counsel Claims.

Among other protections, the Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution "to have the assistance of counsel for his defense." U.S. Const. amend. VI. The applicable federal precedent for ineffective assistance claims is the well-settled two-prong test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

To establish he was denied the effective assistance of counsel under *Strickland*, the movant must show that (1) the performance of trial counsel fell below an objective standard of reasonableness, and (2) the performance of counsel unfairly prejudiced the defense. *Id.* at 687-88, 691, 104 S. Ct. 2052. "Both *Strickland* prongs must be satisfied." *George v. Sively*, 254 F.3d 438, 443 (3d Cir. 2001) (citing *United States v. Nino*, 878 F.2d 101, 104 (3d Cir. 1989)).

The first *Strickland* prong requires a defendant to "establish . . . that counsel's performance was deficient." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). Proving a deficiency in conduct "'requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052). "In assessing counsel's performance, 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id.* (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052).

"Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is to say, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. The benchmark for judging any claim of ineffectiveness of counsel is "whether counsel's conduct so

9

undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*.

The second prong of *Strickland* requires a defendant to show that counsel's performance unfairly prejudiced the defendant, meaning that counsel's errors were so serious as to deprive the defendant of a trial whose result is reliable. *Id*. at 687, 104 S. Ct. 2052. It is not enough to show that the error had some conceivable effect on the outcome of the proceeding, for virtually every act or omission would meet such a test. *Id*. at 693, 104 S. Ct. 2052. Rather, the defendant must show there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id*. at 694, 104 S. Ct. 2052. A reasonable probability is sufficient to undermine confidence in the outcome of the trial. *Id*. The Third Circuit has stated that the "*Strickland* prejudice standard is not 'stringent'- it is, in fact, 'less demanding than the preponderance standard.'" *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011) (quoting *Jermyn*, 266 F.3d at 282).

When an ineffective assistance of counsel claim is brought under § 2254,

> AEDPA review is "doubly deferential," because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt."

*Woods v. Etherton*, 136 S.Ct. 1149, 1151 (2016) (per curiam) (internal citations omitted).

### III. Discussion

Petitioner argues that he is entitled to habeas relief for three reasons. First, he argues that his constitutional rights were violated because police interrogated him while he was in custody without first providing *Miranda* warnings. Second, Petitioner asserts that his trial counsel was ineffective for failing to object to the admission of an inflammatory photograph of the victim. And, third, appellate counsel was ineffective, says Petitioner, by failing to raise the proper issue on direct appeal. I will address

10

those claims in order.

## A. Ground One.

Petitioner first argues for habeas relief on the basis that his constitutional rights were violated when the police failed to give him *Miranda* warnings. (*See* Doc. 1-1, 3). Respondent contends that this claim fails because it was not raised at trial, on direct appeal, or in his original PCRA filings, but was instead pursued by Petitioner for the first time when he appealed the dismissal of his PCRA petition to the Superior Court. (*See* Doc. 6-1, 4-5). The Superior Court found the *Miranda* claim waived because Petitioner did not raise it in his original and amended PCRA petitions. *See Holston*, 2014 WL 10558598, at *4.

Petitioner is not entitled to relief on Ground One of the petition. Petitioner, as stated, did not raise his *Miranda* claim at trial, on direct appeal or, or in his original or amended PCRA petition. "The requirement that claims be raised before the PCRA Court to be preserved for appellate review has been found to be independent and adequate, and this Court agrees with that assessment." *Robinson v. Smith*, No. 17-1023, 2018 WL 3385189, at *8 (E.D. Pa. May 30, 2018) (citing *Suny v. Pennsylvania*, 687 F. App'x 170, 174-75 (3d Cir. 2017) (Superior Court's dismissal of claim due to petitioner's failure to raise it in PCRA Court was based on independent and adequate state ground); *Thomas v. Sec'y Pennsylvania Dep't or Corr.*, 495 F. App'x 200, 206 (3d Cir. 2012) (finding claim procedurally defaulted due to petitioner's failure to "comply with the clear and unambiguous Pennsylvania rules that require each claim to be separately and explicitly asserted in the PCRA petition")). As such, Petitioner's first claim "is procedurally defaulted and the merits of the claim are unreviewable here." *Suny*, 687 F. App'x at 176; *see also Castillo v. Fisher*, No. 14-418, 2018 WL 701857, at *1 (M.D. Pa. Feb. 2, 2018) ("For similar reasons, Petitioner's objection that his sentencing counsel was ineffective for 'failing to file a notice of appeal' must also fail. . . . The issue is waived as it was not one of the issues raised in his PCRA petition."); *Smith v. Nish*, No. 07-1279, 2008 WL 4616850, at *5 (W.D. Pa. Oct. 16,

2008) ("All of the issues of trial counsel's ineffectiveness - other than the three raised in the counseled PCRA petition - that Petitioner raises in Ground One were waived in the state courts because they were never presented in the counseled amended PCRA petition."). Moreover, Petitioner has not provided any argument to support an exception to this procedural default. *See, e.g.*, *Crocker v. Klem*, 450 F. App'x 136, 138-39 (3d Cir. 2011); *Tai-Nan v. Wilson*, 336 F. App'x 256-262 (3d Cir. 2009). The claim for relief in Ground One of the petition will be denied.

**B.    Ground Two.**

In Ground Two of the petition, Petitioner argues that his trial counsel was ineffective for failing to object to the admission of an inflammatory photograph of the victim. Unlike Ground One, Petitioner presented this claim to both the PCRA court and the Superior Court. *See Holston*, 2014 WL 10558598, at *4. The Superior Court, though, rejected this claim, explaining:

> In order to prevail on a claim of ineffective counsel, the appellant must demonstrate that: (1) the underlying claim is of arguable merit; (2) that defense counsel's action or inaction was not grounded on any reasonable basis designed to effectuate the appellant's interest; and, (3) that the appellant suffered prejudice because of the ineffective assistance of counsel. *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987). If it is clear that an appellant has not met the prejudice prong of the ineffectiveness standard, the claim may be dismissed on that basis alone. *Commonwealth v. Travaglia*, 661 A.2d 352, 357 (1995); *see also Strickland v. Washington*, 466 U.S. 668, 697 (1984).
>
> Under *Pierce*, the first inquiry is whether the claim that the photograph admitted into evidence was inflammatory must be of arguable merit. The viewing of photographic evidence in a murder case is, by its nature, a gruesome task. However, photographs of a corpse are not inadmissible *per se*. *Commonwealth v. Hetzel*, 822 A.2d 747, 765 (Pa. Super. 2003). Rather, the admission of such photographs is a matter within the discretion of the trial judge. *Commonwealth v. Tharp*, 830 A.2d 519, 531 (Pa. 2003). The court must conduct a two-part test to determine admissibility. First, it must decide if the photograph is inflammatory. If not, the photograph is admissible if it is relevant and can assist the jury's understanding of the facts. If it is inflammatory, the trial court must decide whether or not the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the

> minds and passions of the jurors. *Id*. In order for a photograph to be deemed inflammatory, "the depiction must be of such a gruesome nature or be cast in such an unfair light that it would tend to cloud an objective assessment of the guilt or innocence of the [appellant]." *Commonwealth v. Dotter*, 589 A.2d 726, 729 (Pa. Super. 1991). The visibility of blood in a photograph, however, does not necessarily require a finding that the photograph is inflammatory. *Commonwealth v. Crawely*, 526 A.2d 334, 341 (Pa. 1987). Furthermore, the condition of the victim's body provides evidence of the assailant's intent, and even where a medical examiner's testimony can describe the body's condition, such testimony does not obviate the admissibility of photographs. *Commonwealth v. Rush*, 646 A.2d 557, 560 (Pa. 1994).
>
> Here, the photograph at issue depicted the position of the victim's body when Sergeant Novacek discovered it. The sergeant testified that the photograph at issue showed "what [he] observed as [he] walked up to the wooden fence where the victim was located. It shows the victim in his final resting place that day . . . his knees bent toward the north, toward the street, and his legs underneath him." The sergeant confirmed that the photograph was a fair and accurate depiction and displayed exactly how he found the victim's body. Despite its gruesome nature, this photograph provided evidence of Holston's intent to murder the victim and assisted the jury in understanding the circumstances of the execution style murder. Therefore, the photograph was relevant in corroborating Sergeant Novacek's testimony as the first responding officer, and it assisted the jury in understanding the circumstances of the murder and Holston's specific intent to kill. Holston's claim that it was inflammatory is without arguable merit.

*Id*. at *4-5 (record citations omitted).

Where, as here, the state court already has rejected an ineffective assistance of counsel claim, a federal court must defer to the state court's decision pursuant to 28 U.S.C. § 2254(d). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 562 U.S. 115, 123, 131 S. Ct. 733, 740, 178 L. Ed. 2d 649 (2011) (quoting *Harrington*, 562 U.S. at 105, 131 S. Ct. at 788). Reiterating that review of this claim is "doubly deferential," Petitioner fails to show that the Superior Court's decision was an unreasonable application of *Strickland* or that it was an unreasonable application of the facts in light of the evidence presented. The Superior Court concluded that

13

Petitioner's claim relating to the introduction of the photograph of the victim at trial failed for lack of arguable merit. The adjudication of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1) and (2). More particularly, counsel was not deficient in failing to object to the photograph because, as detailed by the Superior Court, it was admissible to demonstrate Petitioner's intent and to assist the jury in understanding the circumstances of the execution style murder.[1] *See also United States v. Con-ui*, No. 13-123, 2017 WL 783437, at *3 (M.D. Pa. Mar. 1, 2017) ("Generally, appellate courts have been reluctant to overturn determinations by district courts that photographs, even particularly 'gruesome' ones, are not unfairly prejudicial and are, therefore, admissible."). The Superior Court's application of *Strickland* to Ground Two was reasonable, so that claim will be denied.

**C.     Ground Three.**

Lastly, Petitioner claims his appellate counsel was ineffective by failing to raise the proper issue on direct appeal. Specifically, Petitioner argues that counsel should have made a sufficiency of the evidence argument on appeal rather than a weight of

---

[1]  Further, "the state courts' determination that the trial court's admission of the photograph[ ] was proper under state law is binding upon this court on habeas review." *Bitting v. Kerestes*, No. 16-578, 2017 WL 6886315, at *8 (E.D. Pa. June 19, 2017) (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Sistrunk v. Rozum*, 674 F.3d 181, 186 (3d Cir. 2012) (same). "[F]ederal habeas corpus review does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 68 (1991)); *see also Bisaccia v. Attorney Gen. of N.J.*, 623 F.2d 307, 312 (3d Cir. 1980) ("[i]t is a well-established principle that evidentiary errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial.").

the evidence claim and, as a result, Petitioner was deprived of the effective assistance of counsel. Like Ground Two, this issue was raised before the PCRA court and the Superior Court. But, in finding that claim lacked "arguable merit", the Superior Court reasoned:

> To sustain a conviction of first-degree murder, the Commonwealth must prove beyond a reasonable doubt that: (1) a human being was killed; (2) the accused caused the death; and (3) the accused acted with malice and a specific intent to kill. *Commonwealth v. Chine*, 40 A.3d 1239, 1242 (Pa. Super. 2012). The Commonwealth may prove the specific intent to kill with circumstantial evidence. For instance, the use of a deadly weapon on a vital part of a victim's body is sufficient to establish the specific intent to kill. *Commonwealth v. Fletcher*, 861 A.2d 898, 907 (Pa. 2004). "The existence of legal malice may be inferred and found from the attending circumstances of the act resulting in the death." *Commonwealth v. Gardner*, 416 A.2d 1007, 1008 (Pa. 1980). "It is well settled that specific intent to kill, as well as malice, may be inferred from the use of a deadly weapon upon a vital part of the victim's body." *Id*.
>
> The defense of intoxication is set forth in 18 Pa.C.S. § 308:
>
>> Neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such conditions be introduced to negative the element of intent of the offense, except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder.
>
> *Id*. Evidence of intoxication may be offered by a defendant to reduce murder from a higher degree to a lower degree. *Id*. Intoxication, however, may only reduce murder to a lower degree if the evidence shows that the defendant was "overwhelmed to the point of losing his faculties and sensibilities." *Commonwealth v. Breakiron*, 571 A.2d 1035, 1041 (Pa. 1990). The value of such evidence is generally for the finder of fact, who is free to believe or disbelieve any, all, or none of the testimony addressing intoxication. *Commonwealth v. Fletcher*, 861 A.2d 898, 908 (Pa. 2004).
>
> The Commonwealth presented sufficient evidence at trial to prevail over an intoxication defense. The victim's died from multiple gunshot wounds to the head at close proximity in an execution style murder. Multiple witnesses saw Holston with the victim moments before the killing. Although Holston's trial counsel presented evidence to support his intoxication defense through a toxicologist, Dr. Lawrence Guzzardi, the Commonwealth presented multiple witnesses

15

> who described that Holston did not exhibit overt displays of intoxication. Finally, Edward Polston testified that Holston tried to give him the murder weapon shortly after the killing, thus displaying Holston's awareness of the criminality of his actions in murdering the victim.
>
> For these reasons, Holston's claim that his appellate counsel provided ineffective assistance is devoid of substance.

*Holston*, 2014 WL 10558598, at *5-6 (record citations omitted).

The Superior Court's resolution of this claim was not unreasonable. There was sufficient evidence for which a jury could conclude that an intoxication defense was not established. As the Superior Court explained, multiple witnesses viewed Petitioner moments before the killing who described Petitioner as not displaying overt signs of intoxication. The Commonwealth also presented evidence that Petitioner attempted to give the murder weapon to a different individual shortly after the shooting. On these facts, the Superior Court reasonably applied *Strickland* in determining that his counsel's failure to challenge the sufficiency of the evidence supporting his convictions did not amount to constitutionally ineffective assistance. *See, e.g., Garrett v. Knight*, No. 16-3233, 2018 WL 2150261, at *8 (S.D. Ind. May 10, 2018); *McNally v. Pierce*, No. 12-1303, 2015 WL 7566667, at *7 (D. Del. Nov. 24, 2015); *Jacobs v. Folino*, No. 07-925, 2011 WL 1770899, at *12 (E.D. Pa. May 9, 2011). Ground Three of the petition will be denied.

## IV. Conclusion

For the above stated reasons, the § 2254 petition filed by Petitioner Michael Tyrell Holston will be denied. A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A court may issue a certificate of appealability only when a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing is satisfied when the petitioner demonstrates "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034, 154 L. Ed. 2d 931 (2003). The instant petition does not warrant habeas relief, and reasonable jurists would not find this conclusion to be debatable. Accordingly, a certificate of appealability will not be issued because Petitioner has not made a substantial showing of the denial of his constitutional rights. *See Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000).

    An appropriate order follows.


August 8, 2018                                                            /s/ A. Richard Caputo
Date                                                               A. Richard Caputo
                                                                     United States District Judge